We have four interesting cases we'll hear this morning. And the first one is 24-508-00, United States v. Fullerton. And Ms. Graff. Good morning. Good morning. Good morning. May it please the court. Jessica Graff v. Tiffany Fullerton. Your Honors, the central question at trial was whether Tiffany Fullerton knew she was committing fraud when she opened bank accounts and moved money at her husband's direction. After the jury convicted her and she was sentenced, the defense discovered that Michael Fullerton had done the same thing to his ex-wife in the 1990s, used her without her knowledge to further a fraudulent scheme. That evidence would go to the heart of Tiffany's defense. And while I'm happy to answer the court's question about all three issues raised in the brief, for purposes of my limited time today, I plan to focus on the first two. First, that the district court should have granted a new trial based on this new evidence. And second, that the court erroneously applied an obstruction of justice enhancement. What's the strongest case? And we have several issues on the new trial. One is just due diligence. Another one is, what's your best case where the newly discovered evidence would just bolster defense? It doesn't rebut the prosecution. The best case for that would be United States versus Piazza. Now, in that case, the government kind of made that specific argument that the defense's new evidence doesn't rebut our eyewitness testimony. It doesn't rebut our co-defendant's testimony. And this court said, even if that's true, the fact that it greatly strengthened the defense's case, the defense's case being, it wasn't me, it was my brother who actually sold this stolen gun, that that was enough to prove materiality, even if it didn't directly rebut the key evidence that the government had. And that's what we have here. The facts that we have here. The district court made several layers that you would have to get through. One was, it's inadmissible. And if admissible, immaterial, because it could be inculpatory. In other words, this guy's really good at leaguing up with his wives to defraud people. That's more inculpatory, right? He did it with her, whether there was sort of leverage or not, and then he did it again. Well, the district court never found that perhaps the ex-wife was also in on the fraud. But what the district court did find was that it was inadmissible because it was irrelevant. Because these people. I mean, on that line of thinking, it's 20-year-old evidence about a different crime and a different person. And the defense here, correct me if I'm wrong, was Sienter. She didn't know. That was her entire case. So how would what a prior woman 20 years ago knew reflect anything about what she knew? Because the modus operandi there was the same. What Michael Fullerton's ex-wife said was that Michael had her open a business in her name, that he had her sign checks, that he had her sign business documents, and that she didn't know what any of this was about. And then Michael Fullerton was ultimately convicted of bank fraud. That's what he said. That's what he said. She was unaware, and this is how we did it. But then that becomes the due diligence problem, right? Because the two of them, the government's theory, the jury buys it, is that Michael and Tiffany are indivisible, right? They're texting each other before. I'll take the fall, not you. Then he's going to testify. She prepped him for hours and hours. So in other words, how would there ever be a due diligence? All she has to do is ask him, hey, did you do this before? The due diligence comes in based on two prongs that this court identified in Piazza. One is the witness available, and two, does the defense have some indication that the witness has information relevant to the case? And the second prong is what is lacking here. The defense had no indication that Michael's 1996 divorce was relevant to this case. And of course, the district court pointed out you have access to Michael. You could just ask him. But there still had to be something that would trigger the defense to have some idea that he had this relevant information. But that sounds like a new trial in any case that the defense just doesn't explore its evidence. What's the limiting principle to that? I think the limiting principle is whether it was reasonable for the defense to have some indication that this witness might have some relevant information. Wasn't that a habeas ineffectiveness claim? And I'm assuming you weren't trial counsel. No. OK. No. So the lawyers just didn't do the work. Well, if that's what this court finds in you, I think a 2255 will be the next step. Your other big issue is the suborning perjury, which links up a little bit with what Michael's going to argue. But he's arguing just directly, I didn't lie, or whatever his argument is. Yours is, I do think, the harder one. What is our rule of law, which sort of is the rule of law a sort of passive, active one? In other words, in order to suborn perjury, you have to procure it affirmatively. You can't just delightedly acquiesce in the lie. Is that articulated anywhere clearly in the case law? That is articulated in United States versus Johnson. Because there, the district court But Johnson, I'm just going to interrupt because your time's up. Johnson was the falsity. The district court found no falsity. It wasn't no procurement. It was both, Your Honor. Was it? It was both. Because the district court said, your sister came in here and lied, and you did it with the defendant's knowledge. And this court said, that is not a finding that Johnson procured the testimony. Knowing that a witness will lie is not the same thing as asking the witness to lie. And that same principle is what applies here. The district court said, we have these pretrial texts of Michael saying, I'll take the fall for this. And then the defense attorneys met with Michael for a few days, asked him questions, and ultimately put him on the stand. But what's missing is any affirmative action from Tiffany that she asked Michael to testify, that she coached him on what to say, that she took any affirmative step to induce that false testimony. And a finding to the opposite from this court would be untenable. You're not asking us to say, whenever the lawyer is the one who asked the question, you can never find obstruction for the underlying client. No, Your Honor. I'm saying that there has to be some evidence that the defendant took some affirmative step to procure it. But because otherwise, if we can just surmise, well, you know. What if she said in all the prep, I'd love it if you would really take the fall, as you promised me you would. Then I think that would be. So how do we say it's clear error when the trial judge saw the whole kit and caboodle about these two? It is a clear error finding you're asking us to make. Correct. But even with everything the district court saw, all the district court said was, Michael kept telling you, I'm going to take the fall for this. And then your lawyers called him to the stand and asked him questions. The problem with what holding for the government would mean in this case is that defense attorneys are in an untenable position. Either I call this witness who has favorable information and risk an obstruction of justice enhancement, and then I'm put in the position of defending my client, which is what happened here, where the defense attorneys had to say, no, Tiffany didn't tell us the questions to ask. We interviewed Michael. We determined the questions to ask. This wasn't her. So without that outside evidence of some affirmative act on Tiffany's part, there just isn't enough here for procurement. And a finding to the contrary would be would put these defense attorneys in an untenable position. And also, that holding in this case would put this court in unison with the Fourth Circuit and Leszczynski, where the Fourth Circuit also held that allowing a co-defendant to give false testimony is not the same as inducing or procuring that testimony. And for these reasons, Since I asked a lot of questions, I'm going to add a minute, and we can give a minute to the government also. Because the Starks loan attribution was an issue that I'm slightly interested in. Just in one minute, did you preserve the objection on the basis that you're asserting it now? And two, why doesn't paragraph 23 in the PSR get the government across if there was no rebuttal evidence to it? Because it does say she was involved by April. So one minute. Sure. So on the preservation issue, what the defense objected to was that Tiffany wasn't charged with it, and the government didn't place any blame on her for that loan at trial. And then the government responded, well, we still have enough for relevant conduct, and the district court specifically ruled on that issue, agreeing with the government that it was relevant conduct. So that preserves the issue for appeal. We have a direct ruling on the issue raised. As to the PSR, if we look at paragraphs 26 and 27, all it says is Starks applied for the loan in April, and then after that, the rest of them inspired to submit five additional fraudulent applications. There was no other evidence in the PSR putting Tiffany involved in that loan. Thank you, Counsel. Thank you, Your Honors. Ms. Pruka. Please. Your Honors, may it please the court, Susanna Pruka on behalf of Michael Fullerton. Your Honors, our position in this case is much different than Ms. Fullerton. Mr. Fullerton took responsibility and pled guilty, and the substance of our issues regards to sentencing enhancements. And I would like to start with the first, the organizer leader one, because I think that's the most important one here. OK, although that one is clear error, whereas it looked to me like the obstruction one, you may be implying the district court made legal error, or am I wrong? Well, Your Honor, the court made no findings, did not make the findings we needed to make in order to support. So you're admitting there were lies, and you're admitting they're material, you're just saying procedurally the district court didn't actually say that? Is that the substance of your argument on the perjury? No, Your Honor. Because the court didn't make the required findings, the independent findings that it is required to, then, Your Honor, Mr. Fullerton wasn't able to make arguments regarding whether what lies that he may have told were either lies, or material, or willful. Right, so that's a legal error. You're saying it was a procedural mistake, that district court didn't make findings, because he's admitted he lied. He admitted that repeatedly. Sure doesn't look like it could be immaterial, because it was her entire offense. She didn't know. So I thought your only argument on obstruction was a purely legal one, which is de novo by us, whereas the other, you've got to, but go ahead with the organizer leader, but that is a clear error argument, right? Sorry. The one you began with, the organizer leader. You would have to show that the district court clearly erred. Yes, Your Honor. Sorry, I was just making sure I understood where you wanted to go with it. That's just how I was dividing your issues. I was jumping first to the one we reviewed de novo, but go ahead and start with your strongest argument. Sure, Your Honor. And then I will return to the perjury one. I'm sure that's why the court wants us here today. Your Honor, I think that the organizer under 3B1.1 says that whether you have to be an organizer leader with at least five participants, and I think there's a real question about whether Ms. Gaines is a participant in this. And if we look to the application note of this particular guideline, it says that the person has to be criminally responsible for the commission of the offense. And I don't think that the statement that's provided for in the PSR and relied on by the court is enough to say that Ms. Gaines was criminally responsible for any piece of the offense. At most, it says that she helped Mr. Fullerton put in information in QuickBooks and EasyChecks, but that in and of itself. Did Mr. Fullerton not say that her data entry took weeks and it was a massive project? Did he not say that? I believe he did say that, Your Honor. Okay, well, why couldn't the inferential inference be while she was helping him in this criminal project? Well, Your Honor, I think data entry is not something that requires someone to be criminally responsible for the offense. Maybe, maybe not. Depends, right? Depends on the circumstances. It could depend, Your Honor, but I don't think it's enough here when she didn't produce documents which were submitted to the government on her behalf, right? She put in, she was data entering for Mr. Fullerton to create fraudulent documents for the loan applications. And I think that is the difference in Nexus. You know, Mr. Robles opened accounts and went to the bank. Ms. Fullerton opened accounts and went to the bank and signed things. Ms. Gaines, all she did was enter information into the computer, and I think that's a very- I understand that's your argument, but somebody might say, and she helped him by entering the fraudulent information in the computer. But I, Your Honor, I think we have to go back to what the definition of participant is, and that too is criminally responsible, right? When I look to the cases on this particular element, most of this regards to large-scale criminal enterprises with regards to distribution of drugs. We don't really have it in this particular situation to have, you know, my strongest case for you, except to say, in those cases that I looked at, Your Honor, it was delivering drugs, cutting drugs, packaging drugs. Well, that's not what she was doing. She was doing data entry for Mr. Fullerton then to create those fraudulent documents. Now don't- This is how white-collar crime works. That's delivering the drugs. And I would respectfully disagree. Yeah, what did Michael say when he testified about Ms. Gaines? I'm sorry? When Michael testified, what did he say about Ms. Gaines? Do you recall? I don't recall this, and I can brief that issue. No, no, no, that's all right. If he said, oh, she didn't help me at all, she didn't know, if he said that, then because the jury disbelieved him about saying that about Tiffany, we wouldn't say it's clear error. In other words, the jury and the district court could infer from his false exculpatories, preponderance that she actually did know. Yes, I think there was, my understanding, my memory of his testimony was he didn't implicate her in this vast- Didn't talk about her at all. I think he did talk about her, but it was not in this vast conspiracy that she knew what was going on, Your Honor. And I think, as my time runs down to the end, to turn into that perjury issue, yes, Your Honor, you are right that my issue is, it's not whether he lied or whether it's material. At this point in time, it's that the court didn't make the right findings. In the cases that I cited in my brief and the government discussed in its brief, really it was about, the court has to make findings that he was untruthful, that it was on material matters, and that it impacted the case. And the court did not do that. The government cites our storm decision as similarly, just trial judge, who was there? A, this guy lied. There really wasn't the delineation of those elements, and we upheld it as sufficient. Well, I think the difference between that case and this case, in there, Storm testified to minimize the involvement of his co-defendant. But the court there said that he testified untruthfully, that it was willful, and that it was material. And in this case, the court didn't say that. At most, and I don't have it in front of me, it's back at the desk, Your Honor, but the courts really talked about it in terms of acceptance of responsibility, more so than obstruction of justice, but said, he told a bunch of lies. Okay, sure, he told a bunch of lies, but he didn't make the next step, is that it was on material matters, and that it had an impact on the trial. And I think those two pieces are missing when we look to the Supreme Court case of Dunnegan. Again, they're required, those three elements needed to be stated by the trial court, and he didn't do it in this case, for enough for Mr. Fullerton to be able to provide additional arguments as to whether those issues were lies, were material, or were willful in that particular instance. Thank you, Counsel. Would this court like to hear issues on the other two, or? You decide, you briefly submitted them all. I did, Your Honor. Yes. If there are no questions on the first or second, then I'll reserve anything for rebuttal. Thank you. Thank you. Good morning, may it please the court, Alan Gouley for the United States. And because it's freshest in my mind, I'll start with the perjury finding that Ms. Pruka just addressed. In Boutte, B-O-U-T-T-E, which is cited in our brief, the court said that this court does not reverse so long as, quote, the district court makes a finding that encompasses all of the factual predicates for a finding of perjury. And so the court doesn't actually have to, doesn't have to say the word material and say the word false and say the word willful. And in this case, the district court addressed the issue of Mr. Fullerton's perjury at considerable length. And the things he commented on were that Mr. Fullerton had always planned to take blame and try to exonerate his wife. And that covers willfulness. The judge actually talked about materiality. Yes, on page 985 of the record, and this is Mr. Fullerton's record, it says, the court referred to perjured testimony relating to material matters in the case, those matters being the ones that had been identified in the government's pleadings in this case, as well as the overall issue of Mr. and Mrs. Fullerton's knowledge of the fraudulent scheme. And the district court said repeatedly, Mr. Fullerton got on the stand and lied for hours. So those factual findings cover all of the elements of perjury and the district court's findings were adequate. If I may, I'll turn next to Tiffany Fullerton's new trial argument. Well, maybe just do the parallel. Tiffany, he gets on lies repeatedly and sentencing the district court is pretty darn abrupt with him. Don't argue that you didn't lie. But we certainly don't want a rule where if the defense finds someone who says, I actually did the crime, to discourage defense attorneys from calling those witnesses. I would agree, Your Honor. And that was an argument that was made below. And one thing I would point out, I can respond in several ways, but I would point out that the commentary to this particular guideline cautions the district judge against finding perjury or subordination of perjury in a case simply because the jury didn't agree with the witness and didn't find them credible or the testimony could have been false for any number of other reasons, just mistake or lack of memory. And in this case, I just don't think we're looking at a set of facts where the record just doesn't clearly show the subordination and the perjury. I think as the court already alluded to, the perjury is quite clear. In this case- How should we understand the idea of subordination?  Procurement. Procurement is the key word, Your Honor. So help me distinguish that between, well, I called somebody, I knew he might not tell the truth, but I called him. Well, no, I think calling them is enough. Because I'm not- Calling them is enough? So if there were no evidence of prep? Oh, no, no, no, Your Honor. So it can't be just that you call the witness who lies. No, you would absolutely have to know that they were going to lie and intend that, which is what the record shows here, because this was a very- But Judge Duncan asked a critical question. What about if you acquiesce in it? You're delighted they're gonna lie, but you never intimated to them you wanted them to lie. I think that would still be subordination if you know that they're going to, that's your intent, that's why you call them, is because- But what defendant wouldn't call somebody that's gonna exonerate them? So it's not the attorney says, this is your only chance. But they've never said to that witness, I want you to lie. You can take the hit, you can get the perjury enhancement. Well, I just don't think that that's, well, I'm not aware of a case that says that's required. Your Honor, and- But you said what is required is procurement. That means you have to ask for it. I don't think so, Judge. I really don't- To procure doesn't mean to ask for it. Well- It means to call the witness. See, the witness- Now you're back to calling, but you just said a second ago, it can't be just that the lawyer calls somebody. Correct, you have to- So it's call plus what? Call plus knowledge that this witness is going to lie. And in this case, I think the record shows that that's why they called him. So I think we would have to be able to infer from the evidence that the reason the witness was called was because I know you're going to lie, I want you to lie, it's going to help me, and that's why I'm calling you. I think we have to be able to infer that from the evidence. And I think the court can infer that from this record, Your Honor, because this is an interesting case where Mr. Fullerton testified on cross-examination that he had met with, he had spoken with Tiffany Fullerton in advance of trial and told her what questions her lawyers needed to ask him so that he could exonerate her. And he further testified that once he spent two days meeting with Mrs. Fullerton's, Tiffany Fullerton's lawyers, that they had the same conversation. And that testimony- So text about collusion at the outset and then admissions he made under oath that they spent hours and hours working through the questions? Yes, Your Honor, that's- And Tiffany was present in that prep? No, I don't believe that she was present during the prep sessions with the lawyers. She was, he testified that he had the same kinds of conversations with her in advance. So the smoking gun here, so it's not clear error, is that earlier text between the two of them, I will take the fall? Well, there's that and also his testimony that in advance of trial, he coached her on what, because he hadn't met with her lawyers yet, he coached her on what her lawyers needed to ask him so that he could then give testimony that would be favorable to her. And the case I would like to point out to the court on this particular point is Louder. Let me double check, make sure I've got that right. Yes, so the Louder case is interesting because what was very clear there is that this court approved the district court's inference as to what had happened between A, the defendant, B, her lawyers, and C, the witness. There was no direct evidence of any of that. It was just the fact of those- It's almost impossible to get that evidence. Well, and the district court pointed that out here. And Your Honor, I would also observe that a requirement for the defendant to have gone to a witness and told them to lie or asked them to lie, it would be an odd rule, in my opinion, because the notion of agreements between parties having to be very explicit is largely foreign to the criminal law. Whether it's our conspiracy laws or whatever, people can absolutely arrive at agreements about what they want through kind of a wink and a nod. At sentencing, was Tiffany's lawyer the same lawyer that handled the trial? That had done what, I'm sorry? That was the trial lawyer? Yes. Because there certainly are implications for a lawyer once a district court says, you knowingly asked questions to elicit a lie. What are the implications for the lawyer once the district court makes a finding for a defendant? The only thing I can speak to on that, Judge, because it's all I can tell from the record, is that there was really no suggestion by the court or by the government's attorneys that this was wrongful on the part of the defense attorneys, so much as it was wrongful on the part of the defendant herself. That's a little odd for me, but it's not the issue before us. If the defendant is not present where all the coaching happens, and Michael's telling, this is the question you should ask me, to Tiffany's lawyer, and those are questions designed to elicit false lies about her involvement. Right, and I think the court would only need to find that she knew they were false, and that she talked to them in advance, because he had told her to. He had said, you need to tell my lawyers what to say. As a prosecutor, if you knew those same set of facts, and then you put the witness on, that's an apper violation, right? You lose your license. Oh, absolutely, Judge, and as a trial lawyer, I've been in situations where I was afraid one of my witnesses had said something false that I wasn't expecting, and- You had to correct it immediately. Yes, I immediately have to do a variety of things to correct the record on that. I had difficulty with the Starks loan. You heard some questions. Yes, Your Honor. Basically, am I correct, there's no trial evidence as to her involvement. She was the manager, but there's, correct me if I'm wrong, in other words, her direct involvement in the Starks loan, the first one, the false W-2s. Then we get to sentencing, and the PSR says she was involved as early as April. That's paragraph 23, if I'm right. Then I look at paragraph 26, and it looks like it's the specifics of the Starks loan, and she's not described as involved. So what's, what, you see where I'm going? What is the evidence of her involvement early on? Is there any trial evidence, or are you primarily relying on paragraph 23? Well, no, there's trial evidence, and so, again, as the court knows, this is clear error, and so the district court's finding that Mrs. Fullerton was involved throughout and that only has to be plausible on the whole record. And she isn't charged with it. We're talking about relevant conduct. Absolutely, we're talking about relevant conduct. The Starks loan wasn't even mentioned in the indictment, although there was evidence about it at trial, and to answer the court's question very directly, there was not evidence that she specifically helped Scott Starks prepare that loan package or that she sent it or things of that nature. Instead, the evidence of her early involvement is much more inferential from the circumstances, which I'll explain a few of the circumstances. First of all, it was clear from the trial evidence that the motive for this fraud was the financial distress that Georgetown Collision was in, and they were having all these problems paying their employees and so on and so forth because of the COVID pandemic. Now, both Michael Fullerton and Tiffany Fullerton relied on Georgetown Collision for their livelihood. They had that in common, and so they shared that motive. That's that motive to find a way to generate money that they couldn't generate otherwise. Another thing I would point out is that just on date of her first involvement, rather than just, oh, we've got problems, we're in distress because of COVID, more what I'm wondering is April 2020 evidence that she says, and the solution is PPP fraud. And we don't have testimony that that conversation happened. Your Honor. We're not even having conversations, just what makes it, I know it's clear in review, but if she preserved that, we just have to pinpoint where there's evidence that she was involved at the time the Starks loan occurs. Yes. Because even later 2021 stuff, you all commendably said, we're not gonna hold her accountable for that. That's not part of her loss valuation. Smack in the middle of the conspiracy, the government to its credit was saying those don't count. So I just am wondering how do we pinpoint that first fraud that began the whole thing? So Your Honor, the way I would describe it is this. When the district court, and let me just digress very briefly to say that this really didn't get developed at sentencing because the only argument that defense counsel made about the Starks loan was that it wasn't mentioned in the indictment, ergo, it wasn't illegal, ergo, it's not relevant conduct. And the notion that assuming Tiffany Fullerton joined the conspiracy, she didn't join it until after that is an argument and an idea that the government didn't have an opportunity to respond to, the district court didn't have an opportunity to address. However, if it had done so, the way I would describe it is that in April of 2020, you're looking at Michael Fullerton having hatched a plan to commit a massive PPP loan fraud. And his wife, of course, shares the motive. Number two, she's very involved in the business. She is, according to testimony from employees, she's there several days a week. She's part of the management team. She sometimes is the person to hand out paychecks. And when Michael Fullerton wasn't there, sometimes she was there and the employee said they had to listen to her and do what she said. So you have to wonder, I think, is it plausible that Michael Fullerton would have launched this entire scheme thinking that he could hide it from her and that she just would never find out? I agree with that, but then why did the government itself say there were aspects of it later in the charged conspiracy period that she didn't know about? That, I just don't recall. I think there were, there may have been things that Michael Fullerton did later on that it was just more clear that it, I think this, and I apologize, I don't remember better. I think that may have been in the period after they moved to Oklahoma and they were no longer at Georgetown Collision and it didn't really center around Georgetown Collision in the same way. That's my best recollection, Your Honor. Okay, thank you. Let's see, what else would be good to talk about? Well, maybe, I mean, you can stop, you can continue. There is the Gaines issue for the counting to get. Oh, yes, Your Honor, thank you very much. My argument on that is fairly brief. What we know, and we don't know a whole lot about Tory Gaines, what we can tell from the testimony, and by the way, Michael Fullerton testified, he did, as the court referenced earlier, he did testify about working with her to put a lot of data into the bookkeeping system and then ultimately, what they were generating was apparently companies have to file periodically with the IRS reports about their payroll. Who are they paying? Are they collecting payroll taxes? Things of that nature. It may be called a 940 and a 941, I'm not sure, but they had treated all of their employees as independent contractors, so-called 1099 employees, so they hadn't been doing any of that and they went and they backdated all of this information and falsified information so that they could then, substantially after the fact, because we're talking about the data for 2019, they could generate all of these forms that made it look like they had been paying, they'd been handling payroll all this time, and, which they had not, and in fact, trial testimony showed that all of these IRS forms that were submitted to the payroll protection banks had never been filed with the IRS, which is a long way of saying, what we know about Ms. Gaines, she apparently knew enough about the bookkeeping software and the bookkeeping to be able to assist Mr. Fullerton with a substantial project. He must have needed her to do this and all I would say to the court about that, and of course, it only need be a plausible inference, is that anyone who has a job like that and knows how to work in the bookkeeping software for a company knows that you don't go in and change a bunch of data a year old and then generate forms that weren't generated at the time a year ago and are now being essentially counterfeit. So I think it's a very reasonable inference that she was involved. May I just check my notes for a moment, see if there's anything I'd like to mention? Yes, the issues of sophisticated means, Mr. Fullerton's argument about sophisticated laundering is essentially a double counting argument where he says, oh, all the facts that support the sophisticated laundering enhancement were the same ones that supported the sophisticated means enhancement for the fraud, but that's, I don't believe is true because to avoid a merger problem, the government always has to show some separation between this specified unlawful activity or the underlying conduct and the purge, and the, excuse me, the laundering, and that was true here. Now, there were similarities between the sophisticated means involved in the fraud and in the laundering, but they were different events, different acts, different facts. And so I believe that there was, on an adequate basis, and that's a clear error of view as well. And so I thank the court for the opportunity to be heard, and we ask the court to affirm. Thank you, counsel. May it please the court. On the obstruction issue, both Judge Higginson and Judge Duncan pressed the government, what do we need for procurement? Calling a witness to lie plus what? And the government said that the court only needed to find that Tiffany knew Michael was going to give false testimony and she talked to her attorneys about it. That right there is illustrating the problem with the government's rule, why it just doesn't work, because it requires the court to infer that something happened between Tiffany and her attorneys, that her attorneys have a hard time rebutting without getting into privilege. But you heard my point, acquiescing in a witness lie in open court is the end of a prosecutor's career. Why would it be different? How can any party who knows a witness is going to lie, not only not have to object to the lie and not proffer it, see my point? In other words, knowledge plus acquiescence, even without encouragement, is pretty big implosion of the system. Because then we're still kind of getting into the attorney's role versus the defendant's, and I could point to cases like McCoy, strategy is up to the attorney. There has to be something- But there's no strategy in putting a liar on the stand, if you know they're going to lie. If the attorney knows, that's correct. But here we have to find something that Tiffany did to procure this testimony. And the government says, well, she talked to her attorneys about it. Well, the attorney said, no, she didn't. We knew what questions to ask because we talked to Michael, not because she told us, make sure to ask these questions. So the government's rule here is just too tenuous. We need something extra. And the government says, well, we don't have to have an explicit agreement. And that's true. But in other cases like Kilgaren, this court still found that there was something else where the defendant specifically said, it would be really helpful if you would say this. And then the witness did. So we just don't have that extra set of facts here for procurement, and we'd ask the court to reverse. Thank you, counsel. Cases submit. Oh, you have a rule book. I always do that. We do want to hear from you. We have one minute, okay. I will make it be brilliant. Your Honor, the government came up and talked about that the court made findings on page 985 of the record on the sentencing record. And when you review to that, I will say, yes, they made the findings that we're asking for, but they made the findings as to Ms. Fullerton and the procurement of perjury there. He didn't make those findings as to Mr. Fullerton and his role in the perjury for his guidelines. And I think that's a distinction that's very important in here. If he would have made those findings at the time when he was talking about Mr. Fullerton and the addition of the obstruction of justice enhancement, then we'd have a much different argument before this court. But he didn't make that, and I think that's an important distinction to make with regards to that. Your Honor, and just to briefly address the sophisticated laundering versus sophisticated means, since the government did bring it up during his argument, is when you looked at paragraph 48 of the revised PSR, it relies on the same conduct to say that Mr. Fullerton had sophisticated means for the wire fraud as well as the laundering. And that's what the sentencing guideline says, that you shouldn't be double counting. Yes, he used shell corporations. Yes, he had fake names on the accounts. Yes, he made transfer between the banks. That was true as to the wire fraud and as true as to the laundering. Thank you, counsel. Thank you so much. We appreciate all the arguments, and that is a submission of that case, so we'll call the second.